IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FOLLOWING CELLULAR TELEPHONES CURRENTLY IN THE POSSESSION OF THE U.S. POSTAL INSPECTION SERVICE:<br><br>• A BLACK AND DARK GRAY IPHONE WITH A BLACK PROTECTIVE CASE ASSIGNED CALL NUMBER 401-259-5466, and<br>• A BLACK "BLU" SMARTPHONE | Case No.: 24-SW-197 & 198 PAS<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Richard F. Atwood, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am a United States Postal Inspector employed by the United States Postal Inspection Service (USPIS), Boston Division, Rhode Island Domicile and have been so employed since June 2016.  I have authority to enforce the criminal laws of the United States and to make arrests.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.    I have been a law enforcement officer for over twenty-five (25) years.  I was also previously a U.S. Postal Inspector from June 2003 to August 2009.  In my capacity as a U.S.

Postal Inspector, I investigate a wide variety of offenses and violations of federal criminal law, including offenses involving the transportation of controlled substances and other contraband through the United States Postal Service. From August 2009 to June 2016, I was a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Office of the Special Agent-in-Charge, Boston (SAC/BOS), Airport/Seaport Group.  In that position, I investigated a variety of offenses including violations involving contraband being imported and exported into and out of the United States.  I received training by the USPIS in the investigation of contraband, including stolen goods, narcotics, and counterfeit documents being transported through the United States mails, and in addition, I received training by HSI in the investigation of smuggled goods and/or contraband over interstate and international lines.  Prior to becoming a U.S. Postal Inspector, I was a Police Officer with the Phoenix Police Department for approximately four years, and a Manchester, New Hampshire Police Officer for approximately eight months.  Finally, I have a Bachelor of Arts Degree in History that I received while attending Framingham State College, in Framingham, Massachusetts.

4.     I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; and drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations.  I have participated

in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests.  I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement. The statements contained in this Affidavit are based on information derived from my personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers and video surveillance obtained from U.S. Post Offices; analysis of USPIS databases and records; analysis of public records; recorded calls from the Adult Correctional Institution; analysis of telephone records; and analysis of financial records.

5.    Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not set forth all of the relevant facts known to law enforcement officers.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.    The property (collectively referred to as "the Devices") to be searched are as follows:

   a.    A black and dark gray iPhone with a black protective case assigned call number 401-259-5466, hereinafter "Device 1."  Device 1 is currently located at my office at 24 Corliss Street, Providence, RI.

   b.    A black "BLU" smartphone, hereinafter "Device 2."  Device 2 is currently located at my office.

7.    The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

3

**PROBABLE CAUSE**

8.      The United States, including the U.S. Postal Inspection Service ("USPIS"), is conducting a criminal investigation of Carl Sharp regarding Sharp's suspected methamphetamine trafficking and money laundering activities.  On July 3, 2024, I obtained a federal arrest warrant for Sharp from the Honorable Lincoln D. Almond, U.S. Magistrate Judge – District of Rhode Island for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (distribution of methamphetamine and conspiracy to distribute methamphetamine).  I also obtained a search warrant authorizing the collection of prospective location information for the cellular telephone assigned call number (401) 259-5466, a number used by Sharp.

9.      On July 4, 2024, I received location information from AT&T that led me to believe that Sharp was traveling from Arizona to New England.  The location information placed Sharp at Boston Logan Airport in the early morning hours of July 5, 2024.  Based on the location information that I continued to receive from AT&T, I believe that Sharp traveled to Providence, Rhode Island.  On July 5, 2024, another postal inspector and I, with the assistance of the Providence Police Department, set up surveillance in an area of Providence in which I believe Sharp was located.  I did not observe Sharp during this time and I eventually broke-off surveillance.

10.      I informed the Providence Police Department that I had an arrest warrant for Sharp and asked that they arrest him if they encountered him. I also entered the federal arrest warrant in the NCIC database.  At approximately 1:00 a.m. on July 6, 2024, patrol officers with the Providence Police Department arrested Carl Sharp after he crashed a vehicle on Rugby Street.  The vehicle was registered to Jacqueline Baez.  Officers observed Sharp walking down Rugby Street towards Colfax Street.  Officers contacted Sharp and he admitted that he had been

4

driving the vehicle that crashed.  After learning of his identity, the officers arrested him on the federal arrest warrant that I had obtained on July 3, 2024.  At the time of his arrest, Sharp had the Devices on his person.

11.     When I learned that Providence Police had arrested Sharp, I picked him up at the Providence Police Station and transported him to the Donald W. Wyatt Detention Facility located in Central Falls, RI.  I also collected all of the property that Sharp had on him at the time of his arrest.  This included the Devices.

12.     The Devices are currently in storage at my office located at 24 Corliss Street, Providence, RI.  Prior to placing the Devices in storage, I dialed telephone number (401) 259-5466.  **Device 1** rang.  **Device 1** was in Airplane Mode.  I put **Device 2** in Airplane Mode.  In my training and experience, it is necessary to place seized cellular telephones in Airplane Mode so that they cannot be remotely accessed or "wiped."  I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the USPIS.

13.     The details of my investigation and why I believe evidence related to Sharp's drug trafficking and money laundering activities will be located on the Devices is set forth below:

## Summary of the drug trafficking conspiracy

14.     In mid-November 2022, USPIS Inspectors began to investigate Carl Sharp and other individuals who were suspected of using the U.S. mail to ship controlled substances from Arizona, California, and Nevada, to Rhode Island, and to ship money from Rhode Island to the West.  Inspectors identified 16 USPS Priority Mail parcels that were shipped from Arizona, California, and Nevada to numerous addresses in the Providence Metro Area, and 6 parcels that

5

were shipped from Rhode Island to the West.  Investigators seized and searched four of these

packages pursuant to federal search warrants and recovered 4.44 kilograms of

methamphetamines, 249 grams of cocaine, and $3,000.  The other packages, which were linked

to the investigation by the recipient or sender addresses and/or the Internet Protocol ("IP")

address[1] used by the devices that queried the delivery status of the packages, were likewise

believed to contain controlled substances or money based upon their size, labeling, connections

to known drug or money packages, the manner of shipment, and where known, the identity of the

shipper.  The below table is a summary of these packages, which are described in greater detail

later in this affidavit:

|  | Shipped | Parcel Name | Video - Mailer | LPR - Mailer | Notes |
|---|---|---|---|---|---|
| 1 | 11/3/22 | WHITMARSH PARCEL 1 | **SHARP** | AZ plate, Jeep Cherokee registered to MITCHELL | |
| 2 | 11/8/22 | BROWNING AVE PARCEL 1 | | | Same IP querying WHITMARSH PARCEL 2 |
| 3 | 11/12/22 | WHITMARSH PARCEL 2 | **SHARP** | Kia sedan, unknown plate | Same IP querying BROWNING AVE PARCEL 1 |
| 4 | 11/27/22 | BROWNING AVE PARCEL 2 | **SHARP**/ MANNING | | |
| 5 | 11/22/22 | WHITMARSH | Unknown | | Contents: **1320.91 grams of** |

---

[1] An IP address is a unique address that identifies a device connected to the internet or a local network.  In this case, each of the packages tracked were tracked by at least one mobile IP, that is, an IP address associated with a cellular telephone or other mobile device.

| | | PARCEL 3 SEIZED | African American male | | **methamphetamine, 249.29 grams of cocaine** Latent fingerprints developed. No identifications. |
|---|---|---|---|---|---|
| 6 | 12/24/22 | MARIETTA ST PARCEL 2 | | | Manning resided in an apartment at 50 Marietta Street |
| 7 | 1/17/23 | BROWNING AVE PARCEL 3 | | | Same IP tracking GLENDALE PO BOX PARCELs 1 and 2 |
| 8 | 1/19/23 | POTTERS AVE PARCEL 2 | | | Same IP tracking BROWNING AVE PARCEL 3 and 4 |
| 9 | 1/20/23 | BROWNING AVE PARCEL 4 | | | Wolfe contacted USPS Customer Service on parcel whereabouts. Same IP tracking MARIETTA ST PARCEL 1 |
| 10 | 1/21/23 | MARIETTA ST PARCEL 1 | | | Manning resided in an apartment at 50 Marietta Street |
| 11 | 1/26/23 | GLENDALE PO BOX PARCEL 2 | | | Sharp's P.O. Box; Wolfe listed as sender of this package Same IP tracking MOORPARK ST PARCEL 1 and CERINI AVE PARCEL |
| 12 | 1/26/23 | MOORPARK ST PARCEL 1 | | | Same IP tracking GLENDALE PO BOX PARCEL 2 |
| 13 | 1/30/23 | GLENDALE PO BOX PARCEL 1 | | | Sharp's P.O. Box; Wolfe listed as sender of the package |
| 14 | 2/3/23 | CERINI AVE PARCEL | | | Same IP tracking GLENDALE PO BOX PARCEL 2 |
| 15 | 2/28/23 | POTTERS AVE PARCEL 1 | **SHARP** | | |
| 16 | 3/10/23 | MARIETTA ST PARCEL 3 | | | Manning resided in an apartment at 50 Marietta Street |
| 17 | 3/21/23 | SACK ST PARCEL 2 | **SHARP** | | |

| 18 | 3/28/23 | SACK ST PARCEL 1<br><br>SEIZED | **SHARP** | AZ plate, Infiniti registered to **Sharp** | Contents: **1353.8 grams of methamphetamine**<br><br>Same IP querying MOORPARK ST PARCEL 2<br><br>Latent fingerprints developed. No identifications. |
| 19 | 3/29/23 | MOORPARK ST PARCEL 2<br><br>SEIZED | Wolfe | | Contents: **$3000 in cash**<br><br>Same IP querying SACK ST PARCEL 1<br><br>Latent fingerprints developed belonging to Jose Efrain Sosa and unidentified fingerprints developed. |
| 20 | 4/29/23 | COLUMBIA ST PARCEL 2 | | | Wolfe was the property manager at the Columbia Street apartments |
| 21 | 5/13/23 | COLUMBIA ST PARCEL 3 | | | Wolfe was the property manager at the Columbia Street apartments |
| 22 | 6/17/23 | COLUMBIA ST PARCEL 1<br><br>SEIZED | **SHARP** | | Contents: **1765.4 grams of methamphetamine**<br><br>Latent fingerprints developed belonging to **SHARP** and unidentified fingerprints developed. |

15.     Once I identified Sharp as a suspect in this investigation, I conducted a criminal history query on him and learned that he had an extensive criminal history in Rhode Island dating back to 1994. Sharp has been arrested for domestic violence assault, disorderly conduct, trespassing, possession of a controlled substances, possession of 1- 5 kilograms of marijuana and various traffic related offenses. Sharp was charged with murder and a drive by shooting but was acquitted in 1998. Sharp is currently on minimum probation until 2033 for his previous Rhode

Island state felony convictions for conspiracy and possession of controlled substances with intent to deliver. I am aware that Sharp continues to have family ties in Rhode Island, and I obtained airline records that demonstrate that Sharp frequently flies to airports in or near Rhode Island.

16. As described in the table above and in greater detail later on in this affidavit, the investigation also revealed that at least two other Rhode Islanders were associated with Sharp and the shipment of suspected drug and money packages, William Wolfe[2] and Tajah Manning.[3] Both of these individuals also had lengthy criminal histories. I am aware that in August 2023, Manning was arrested by the Providence Police Department for cocaine trafficking, and on December 4, 2023, Wolfe was arrested by the Pawtucket Police Department for methamphetamine trafficking. Both were incarcerated at the ACI in Cranston, RI, and as of July 1, 2024, they both remain at the ACI.

17. I also conducted a financial investigation of Sharp with the assistance of the FBI. I learned that Sharp maintained a personal bank account at Bank of America. Between January 2022 and May 2024, Sharp deposited over $320,000 in cash into his personal bank account. Most of these cash deposits were made at ATMs in Arizona and Rhode Island, although some of the deposits were made in California, Nevada, and Massachusetts. Based on my training and experience, I know that drug traffickers often handle large amounts of cash. I am also aware that

---

[2] A criminal history query on WOLFE revealed a criminal history dating back to 1992, to include arrests for trespassing, disorderly conduct, possession of concealed weapons and possession of controlled substances.

[3] MANNING's arrest history includes arrest for Possession of a schedule I-V controlled substance, possession of marijuana, receiving stolen property, trespassing, resisting arrest, weapons possession other than firearms, felony assault, robbery, and failure to appear. MANNING has numerous narcotic convictions, to include two convictions for Possession of a Controlled Substance and three convictions for Manufacturing/Possession/ Delivering a Schedule I/II Controlled Substance.

during that same time frame Sharp withdrew over $225,000 in cash at casinos. Based on my training and experience, I know that casinos are often used to launder money by converting illicit funds into chips and then cashing out those chips after gambling.

### Summary of Sharp's use of cellular telephones during the drug conspiracy

18.    Since the investigation began, I believe that Sharp has switched cellular telephone numbers twice and service providers once. In my training and experience, drug dealers often switch cellular telephones to avoid detection by law enforcement. They often switch cellular telephones when they or an associate have contact with law enforcement.

19.    All three of the telephone numbers that I believe that Sharp has used were subscribed to his child's mother, Natisha Mitchell. In my training and experience, drug dealers often put cellular telephones in the names of others to avoid detection by law enforcement.

20.    At present, I believe that Sharp is using a cellular telephone assigned telephone number (401) 259-5466 (**Device 1**) with service provided by AT&T. According to the subscriber records provided by AT&T in March 2024, **Device 1** is subscribed to Natisha M. Mitchell with her and Sharp's residence in Arizona as the address listed. **Device 1** has been active since December 18, 2023, two weeks after Wolfe was arrested by the Pawtucket Police.

21.    I obtained records for each of the cellular telephone numbers that I believe Sharp has used since the investigation began, including the number associated with **Device 1**. Each number used by Sharp had contacts with his criminal associates during the period it was used. For example, between 1/1/22 and 9/11/22, Sharp's number (401) 660-0083 had 168 contacts

with (401) 477-2188, a number used by Wolfe.[4]  Likewise, Sharp's number (401) 660-5151 had

one contact with (401) 477-2188 on November 28, 2023, and two contacts on September 7, 2023

with (401) 999-4101, which I believe to be Wolfe's girlfriend, Trish Traynor's number.[5]

Between December 26, 2023, and March 17, 2024, (401) 259-5466, the number associated with

**Device 1**, had 32 contacts with inmates at the ACI to include 27 calls from Manning, four calls

from Wolfe, and one call was from Traynor.  A review of these calls, which were obtained by

subpoena, revealed that each person (Manning, Wolfe, and Traynor) was speaking to a male on

(401) 259-5466 and addressed that person as "Carl" on several occasions.

22.     Although I believe that Sharp has switched cellular phones several times during

his criminal activity, I am aware that modern mobile devices allow for synchronous back up and

the restoration of data to other devices via the Cloud.  Both Apple and Google provide services

that allow for regular incremental back-ups of mobile devices that are stored within the iCloud or

Google Drive services, respectively.  These backups are set to occur automatically by default and

are linked to the user's account.  These backups can by utilized to sync across multiple devices

when the user's account is used to sign in on each device. This gives the user access to the files

even when those files were originally created or stored on a different device.  This is most

common when a user upgrades their mobile device.  When a user signs in to their account, the

cloud service will sync the data stored from their previous mobile device to their new mobile

--------------------------------

[4] Based on USPS Customer Service records, I believe that the number belonged to Wolfe
because on February 13, 2023, Wolfe called the USPS customer service center inquiring about
BROWNING AVE PARCEL 4.

[5] Based on USPS Customer Service records, I believe that the number belonged to Traynor
because on February 13, 2023, Traynor called the USPS customer service center inquiring about
BROWNING AVE PARCEL 4.

device. This will then repeat when the user upgrades this new device in the future. Therefore, I believe that it is likely that **Device 1** and **Device 2** will contain information and data acquired while Sharp was using other cellular phones.

### The Drug and Money Packages

### WHITMARSH PARCELS 1 and 2 mailed by Sharp and WHITMARSH PARCEL 3 mailed by an unknown man

23.     Beginning in mid-November 2022, while utilizing USPS databases, I identified 61 Whitmarsh Street, Providence, RI, 02907 as the first address being used by Sharp to ship narcotics. I identified 61 Whitmarsh Street as an address that had received two Priority Mail parcels, shipped from different post offices in the Phoenix Metro Area, on November 3 and 12, 2022.[6]

24.     The first Priority Mail parcel[7] (herein referred to as WHITMARSH PARCEL 1) was shipped on November 3, 2022, from the Phoenix Capital Station Post Office and was addressed to "William Freitus" at "61 Whitmarsh St Providence RI 02907." The return sender/address was listed as "m. Wallace 9652 N 31st Ave Phoenix AZ 85051."

25.     The second Priority Mail parcel (herein referred to as WHITMARSH PARCEL 2) was shipped on November 12, 2022, from the Phoenix General Mail Facility (GMF), located at 4949 E. Van Buren Street, Phoenix, AZ 85026 and was addressed to "William Freitus" at "61

---

[6] Parcels were delivered on or about November 7 and 14, 2022.

[7] Upon initial review, the USPS product tracking record for WHITMARSH PARCEL 1, listed the physical recipient address as 103 Whitmarsh St Providence, RI 02907; however, a review of parcels images revealed the actual recipient address to be 61 Whitmarsh Street, Providence, RI, 02907.

Whitmarsh St Providence RI 02907." The return sender/address was listed as "m. Wallace 9652 N 31st Ave Phoenix AZ 85051."

26.     Regarding the sender information listed on both WHITMARSH PARCELS, using U.S. Postal Database/Postal verifications systems and CLEAR databases, which maintains names, addresses, and zip code information, I verified "9652 N 31st Ave Phoenix AZ 85051" was a legitimate address; however, the name "m. Wallace" was not associated at the address. Based on the USPIS analysis described above and my own experience, I know narcotics traffickers often use fictitious sender names along with legitimate return addresses on parcels containing controlled substances or proceeds from the sale of controlled substances. The return address lends a legitimate appearance to the parcel; however, in the event the parcel is intercepted by law enforcement, the false sender's name protects the true identity of the mailer. In fact, the return address, "9652 N 31st Ave Phoenix AZ 85051" is a large apartment complex, but the sender failed to list an apartment number in the event the parcel was returned to the sender.

27.     Regarding the addressee information, I verified that "61 Whitmarsh St. Providence RI 02907" is a legitimate address; and the recipient "WilliAm Freitus" does receive mail at the address. In fact, the letter carrier for that route advised "Freitus" had recently moved in as of November 2022, even though there was no record of a change of address to "61 Whitmarsh St. Providence RI 02907."

28.     On or about November 22, 2022, I learned that a third parcel was shipped to 61 Whitmarsh Street, Providence on November 21, 2022, from Peoria, Arizona (hereinafter WHITMARSH PARCEL 3). On November 23, 2022, I contacted Postal Inspector Michael Kaminski and Intelligence Analyst (IA) Contractor Ben Felice in the Phoenix Inspection Service

13

Office requesting assistance on possibly locating video surveillance for the mailing of

WHITMARSH PARCEL 1, WHITMARSH PARCEL 2, and WHITMARSH PARCEL 3.

29.     IA Felice was able to locate and provide surveillance photos for the mailing of

WHITMARSH PARCEL 1 on November 3, 2022, and the mailing of WHITMARSH PARCEL

2 on November 12, 2022. A review of the surveillance photos from the November 3rd mailing

depicted an African American male, wearing a gray hooded sweatshirt, sweatpants, and black

baseball hat shipping WHITMARSH PARCEL 1.

30.     The Capital Station Post Office also had a license plate reader (LPR) surveillance

camera, which captured the vehicle the African American male was operating, which was a red

4-door Jeep Cherokee, bearing Arizona license plate, CLG-9106.  A registration query on the

Jeep Cherokee revealed the vehicle was registered to the following person:

- Registered Party: Natisha Mitchell (born in 1973)
- Address: 8201 W Olive Ave Unit 1095 Peoria, AZ 85345-7177
- Mailing Address: Po Box 1232 Glendale, AZ 85311-1232

31.     Using the CLEAR database, which contains data on names, addresses, and phone

numbers, I queried Natisha Mitchell (herein referred to as "Mitchell") and discovered Mitchell

was formerly from Rhode Island.  Additionally, based on the CLEAR query, I discovered that

Sharp also resided at the Olive Avenue Peoria, AZ address.  Then, I queried USPS databases and

discovered a change of address was filed on November 3, 2022, for the Sharp Family and

Mitchell Family, forwarding their mail from "8201 W. Olive Avenue, unit 1095, Peoria, Arizona

85345" to "9190 N. 83rd Avenue Unit 1106, Peoria, AZ 85345," Sharp's residence.  A driver's

license query on Sharp in Arizona revealed the following:

- Address Information: 8201 W Olive Ave unit 1095; Peoria, AZ 85345.
- Primary Contact Address: PO Box 1232; Glendale, AZ 85311-1232.

14

32.     A review of the surveillance photos from the Phoenix General Mail Facility (GMF) for the mailing of WHITMARSH PARCEL 2, depicted an African American male, wearing a black Nike hooded sweatshirt, gray Nike sweat shorts and black Nike baseball hat shipping WHITMARSH PARCEL 2. The African American male was the same individual who shipped WHITMARSH PARCEL 1 on November 3, 2022.

33.     The GMF was equipped with a license plate reader surveillance camera, which captured the vehicle the African American male was operating, which was a black Kia sedan; however, the license plate reader had the sun reflecting on it which blurred the license plate.

34.     I then discovered Sharp previously had a Rhode Island Driver's License that expired on October 30, 2021. I reviewed Sharp's former Rhode Island driver's license photograph and compared it with the surveillance video from the previous mailings at the Phoenix post offices.  Based upon my review, I believe that it was Sharp who shipped the parcels on November 3, 2022, and November 12, 2022.

35.     On November 25, 2022, I was able to intercept WHITMARSH ST PARCEL 3 addressed to "WilliAm Freitus 61 Whitmarsh St. Providence RI 02907" with a return address of "T. Wallace 5205 W. Thunderbird Rd #2105 Glendale AZ 85306" in the mail stream at the Elmwood Post Office, located at 820 Elmwood Avenue, Providence, RI 02907. The WHITMARSH PARCEL 3 label indicates that this parcel was mailed on November 21, 2022, from Peoria, AZ 85345.

36.     On November 29, 2022, the Honorable Patricia A. Sullivan, Magistrate Judge for the District of Rhode Island, authorized a search warrant (see case no.: 22-SW-379-PAS) for WHITMARSH ST PARCEL 3.  On the same date, Inspector James Foley and I executed the search warrant and discovered 3 Ziploc bags of methamphetamine and one Ziploc bag of cocaine

15

concealed inside the lining of a blue, winter vest/coat.  I sent the drugs to the USPIS Forensic Laboratory Services where they were analyzed by a chemist and determined to be 1,320.91 grams of crystalline powder containing d-methamphetamine hydrochloride and 249.28 grams of a white powder containing cocaine hydrochloride.  Quantitative analysis of a composite from the 3 methamphetamine samples was found to contain $98 \pm 3\%$ d-methamphetamine hydrochloride.

37.      On December 1, 2022, Phoenix Division Task Force Officer (TFO) Kevin Vanderwood provided me with a surveillance photo from the contract postal unit station that accepted WHITMARSH ST PARCEL 3 for shipment.  The photo depicted an African American wearing a jacket, brown shirt and baseball hat shipping the WHITMARSH ST PARCEL 3; however, the surveillance photo did not resemble Sharp.

### Related parcels – BROWNING AVE, GLENDALE PO BOX, and MOORPARK ST

38.      I began to review USPS proprietary databases and determined that an individual or device queried the mailing status of WHITMARSH PARCEL 2 using the same IP address as an individual or device that was querying the mailing status of a parcel shipped from the Garden City Post Office, located in Cranston, Rhode Island, to Fresno, California on November 8, 2022. This led me to conclude the packages are related. I have found in my training and experience that even when packages containing narcotics are shipped to different areas to avoid law enforcement detection, one individual will monitor the packages to ensure they arrive on time and are not interdicted by law enforcement.

39.      I am aware that the IP address used to track the packages was a T-Mobile communications IP address, which suggests to me that the individual tracking the packages was using his or her cellular telephone.  I am also aware that the USPS website that allows an individual to track packages may be accessed from a cellular telephone.  In my training and

experience, I have searched cellular telephones of suspects and recovered evidence that the user of the cellular telephone was tracking postal packages.

40.     I used USPS databases to obtain a parcel image for the Fresno, California parcel (herein referred to as the BROWNING AVE PARCEL 1). The details listed on the parcel image are as followed:

- From: m. Thomas 228 Potters Ave Prov RI 02905.
- To: Jose Licea 3503 W. Browning Ave Fresno CA 93711.

41.     I reviewed USPS proprietary databases and learned that an individual or device querying the mailing status of BROWNING AVE PARCEL 1, used the same IP address[8] as an individual or device that queried the status of parcels shipped to the following addresses:

- To: Carl Sharp PO Box 1232 Glendale Az 85311; from: W. Wolfe 165 Flint Ave Cranston RI 02910 (hereinafter referred to as GLENDALE PO BOX PARCEL 1) shipped on or about January 30, 2023.

- To: Natasha Mitchell Po Box 1232 Glendale Az 85311; from: W. Wolfe 1827 Pawtucket Ave E. Prov RO 02914 (hereinafter referred to as GLENDALE PO BOX PARCEL 2) shipped on or about January 26, 2023.

42.     An additional review of USPS proprietary databases revealed that an individual or device querying the mailing status of GLENDALE PO BOX PARCEL 2, used the same IP address[9] as an individual or device that queried the status of parcels shipped to "ADRian miller 10707 Moorpark St Apt 304 Toluca lake CA 91602" from "J Baez 430 W. Friendship St Prov RI 02907" (hereinafter referred to as MOORPARK ST PARCEL 1) shipped on January 26, 2023.

---

[8] A T-Mobile Communications IP had tracked the parcel and during this period, cellular phones being utilized by Sharp and Mitchell were being serviced by T-Mobile.

[9] A T-Mobile Communications IP had tracked the parcel and during this period, cellular phones being utilized by Sharp and Mitchell were being serviced by T-Mobile.

43.     Additionally, a review of USPS databases for the shipping transactions from January 26, 2023 (the mailings of GLENDALE PO BOX PARCEL 2 and MOORPARK ST PARCEL 1) revealed that the two parcels were mailed from two locations in Cranston, RI within 12 minutes of each other.

44.     I reviewed USPS proprietary databases on WHITMARSH PARCEL 3 and learned that an individual or device querying the mailing status of WHITMARSH PARCEL 3 used the same IP address[10] as an individual or device that queried the status of a parcel shipped from the Providence Main Window Unit, located at 24 Corliss Street, Providence, Rhode Island to Fresno, California, on November 17, 2022.  Based on this information, I concluded that the packages were related.

45.     Using USPS databases, I located a parcel image for the Fresno, California parcel (herein referred to as BROWNING AVE PARCEL 2). The details listed on the parcel image are as followed:

- From: T. George 430 friendship st Prov RI 02907.
- To: Jose Licea 3503 W. Browning Ave Fresno CA 93711.

46.     Regarding the sender information listed on BROWNING AVE PARCEL 2, using U.S. Postal Database/Postal verifications systems and CLEAR databases, I verified that "T. George 430 friendship st Prov RI 02907" was a legitimate address; however, the name "T. George" was not associated at the address.

---

[10] A T-Mobile Communications IP had tracked the parcel and during this period, cellular phones being utilized by Sharp and Mitchell were being serviced by T-Mobile.

47.    Regarding the addressee information, I had previously verified that the address, "3503 W. Browning Ave Fresno CA 93711" was a legitimate address; however, the recipient "Jose Licea" does not currently receive mail there.

48.    I reviewed the surveillance footage captured on November 17, 2022, from the Providence Main Window Unit for the mailing of BROWNING AVE PARCEL 2. The video depicted two African American males, entering the post office lobby at approximately 6:51 pm. The first African American male, was an older male, wearing black sweatpants and a white hooded sweatshirt. The second African American male was a younger male, wearing gray jeans and a gray hooded sweatshirt, and holding a cell phone. I then reviewed Sharp's former Rhode Island driver's license photograph and compared it with the surveillance video from the Providence Main Window Unit.  Based upon my review, I believe that it was Sharp who shipped BROWNING AVE PARCEL 2.  The remaining video depicted Sharp shipping BROWNING AVE PARCEL 2, while the younger unidentified male was standing further back, watching Sharp and texting on his cell phone.  I later identified the younger male as Manning.

**Related Parcels – POTTERS AVE, BROWNING AVE, MARIETTA ST**

49.    Inspectors also continued to monitor parcels shipped to the return addresses that were listed on the WHITMARSH AVE and BROWNING AVE parcels.  On or about March 2, 2023, Inspectors learned a parcel was shipped from Fontana, California on February 28, 2023, to 228 Potters Avenue, Providence, RI 02905.  I was able to locate the parcel (herein referred to as the POTTERS AVE PARCEL 1) and noted the following details on the parcel:

- From: J. Reynolds, 210 N. Beechwood Ave Rialto CA 92376
- To: Chealsea Curtis 228 Potters ave 3rd flr Providence RI 02905

50.    On or about March 2, 2023, I contacted the USPIS Los Angeles Division requesting assistance with obtaining possible surveillance video from the Fontana CA Post

Office for the mailing of POTTERS AVE PARCEL 1 from February 28, 2023.  On March 15,

2023, Daniel Joy, Senior Technical Surveillance Specialist (STSS) provided me with the

surveillance video from that office.  I reviewed the video and observed an African American

male, wearing a gray hooded zipped sweatshirt and black baseball hat approach the counter with

POTTERS AVE PARCEL 1.  I reviewed Sharp's former Rhode Island driver's license

photograph and compared it with the surveillance video from the Fontana CA Post Office.

Based upon my review, I believe that it was Sharp who shipped POTTERS AVE PARCEL 1.

51.    A query of USPS databases revealed 228 Potters Avenue had previously received

another parcel that was shipped from Fontana, California on or about January 19, 2023

(hereinafter referred to as POTTERS AVE PARCEL 2).

52.    A review of USPS proprietary databases revealed that an individual or device

querying the mailing status of POTTERS AVE PARCEL 2 on or about January 19, 2023, used

the same IP address[11] as an individual or device that queried the status of parcels shipped to the

following address:

- 3505 W. Browning Ave, Fresno, CA 93705 (BROWNING AVE PARCEL 3) –
  shipped on or about January 17, 2023.
- 3505 W. Browning Ave, Fresno, CA 93705 (BROWNING AVE PARCEL 4) –
  shipped on or about January 20, 2023.

53.    It should be noted that 3505 W. Browning Avenue, Fresno, does not exist, there is

only 3503 W. Browning Avenue.  It is unknown whether BROWNING AVE PARCEL 3 was

delivered or returned to sender because USPS records had been purged by the time it was

---

[11]A T-Mobile Communications IP had tracked the parcel and during this period, cellular phones
being utilized by Sharp and Mitchell were being serviced by T-Mobile.

discovered; however, BROWNING AVE PARCEL 4 was marked return to the sender on or about January 27, 2023.

54.     A review of the same USPS proprietary databases, revealed that an individual or device querying the mailing status of BROWNING AVE PARCEL 4, used the same IP address[12] as an individual or device that queried the status of a parcel shipped to: Miosotis Fortunato 50 Marietta St. Apt #1 Providence RI 02904[13] from M. Latimer 3651 S. Arville St Las Vegas NV 89103 (hereinafter referred to as MARIETTA ST PARCEL 1) shipped on January 21, 2023.

55.     A review of USPS databases on previous parcels shipped to 50 Marietta Street, Providence, revealed another parcel was shipped from Las Vegas, NV to the address on December 24, 2022.  The details of that parcel are: To: Miosotis Fortunato 50 Marietta St. Apt. 1 Providence RI 02904 and from: M. Riley 320 Conestoga Way Henderson, NV 89002 (herein after referred to as MARIETTA ST PARCEL 2).

56.     On or about March 16, 2023, while reviewing USPS databases, I learned that another Priority Mail parcel was shipped to 50 Marietta Street, Providence, RI 02904 on March 10, 2023, from the Washington Station Post Office, located at 8155 N Black Canyon Hwy Phoenix, AZ 85021.  I was able to locate an image of the parcel (hereinafter referred to as MARIETTA ST PARCEL 3).  Unfortunately, the video surveillance at the Washington Station Post Office was disabled, so it is unknown who shipped MARIETTA ST PARCEL 3.  The

---

[12] A T-Mobile Communications IP had tracked the parcel and during this period, cellular phones being utilized by Sharp and Mitchell were being serviced by T-Mobile.

[13] Manning, a known associate of Sharp's, resided at 50 Marietta Street, Apt. 2R (2nd floor, rear), Providence, RI prior to his arrest by Providence Police Department in August 2023.

details of MARIETTA ST PARCEL 3 are:  To: Markus Richardson 50 Marietta St 3RD floor

Prov RI 02904 and from: D. Richardson 2323 W. Dunlap ave Phoenix AZ 85021.

## Sharp mails SACK ST PARCELS 1 and 2 to an address previously used by him to receive drugs in the mail

57.     On or about March 30, 2023, while continuing to monitor parcels being shipped

from the Southwest Border (Arizona, Nevada and, California), I identified a Priority Mail Parcel

that had been shipped from Phoenix, Arizona on March 28, 2023. The Priority Mail Parcel was

addressed to "Kevin Delgado 26 Sack St 2nd Floor N. Prov RI 02911" with a return address of

"T. Nelson 10000 W. Missouri Ave Glendale AZ 85307" (hereinafter referred to as "SACK ST

PARCEL 1").

58.     On March 31, 2023, with the assistance from the USPIS Phoenix Office,

surveillance video was obtained from the Capital Station Post Office for the mailing of SACK

ST PARCEL 1.  The surveillance video depicted an African American male, wearing a black

baseball hat and black hooded sweatshirt.  I reviewed the surveillance video and compared it

with Sharp's RI driver's license photograph, and based upon my review, I believe that it was

Sharp who shipped SACK ST PARCEL 1.  Additionally, the Capital Station Post Office was

equipped with a license plate reader surveillance camera, which captured the vehicle Sharp was

operating, which was a silver Infiniti Q50, bearing Arizona license plate, S5A-50L, registered to

Sharp at 8201 W. Olive Avenue, unit 1095, Peoria, Arizona 85345.

59.     I then conducted an address history query for parcels shipped to 26 Sack Street,

N. Providence, Rhode Island and discovered on March 21, 2023, a Priority Mail parcel was

shipped from the Glendale Post Office to the Sack Street address.  A review of USPS databases

revealed an image of the parcel (hereinafter referred to as the "SACK ST PARCEL 2"), which revealed the same sender and recipient information that is listed on the SACK ST PARCEL 1.

60.     Again, with the assistance of Inspectors in the Phoenix Division, surveillance video was obtained from the Glendale Post Office, which depicted an African American male, wearing a black hooded sweatshirt and black baseball hat.  I reviewed the surveillance video and compared it with Sharp's RI driver's license photograph, and based upon my review, I again believe that it was Sharp shipping SACK ST PARCEL 2.

61.     On April 3, 2023, the Honorable Patricia A. Sullivan, Magistrate Judge for the District of Rhode Island, authorized a search warrant for SACK ST PARCEL 1.  On the same date, Postal Inspector Michael Maccarone and I executed the search warrant and discovered that the parcel contained two heavily saran wrapped bundles, concealing a Ziploc and a vacuum sealed bag, which contained crystallized rock like substance that field tested (TruNarc) positive for methamphetamines.  These bundles were concealed within the sleeves of a black zip hooded sweatshirt.  I sent the drugs to the USPIS Forensic Laboratory Services where they were analyzed by a chemist and determined to be 1,353.8 grams of crystalline powder containing d-methamphetamine hydrochloride.  Quantitative analysis of a composite from the 2 samples was found to contain $98 \pm 3\%$ d-methamphetamine hydrochloride.

62.     A review of USPIS databases on the address 26 Sack Street, N. Providence revealed a previous USPIS investigation that was initiated on May 2, 2012.  In short, Providence Domicile Inspectors initiated an investigation into 27-pound Express Mail parcel referred to them by Inspectors in the Phoenix Division.  A federal search warrant was issued by the Honorable David L. Martin, Magistrate Judge for the District of Rhode Island, case no.: 1:12-MJ-131M. The warrant was executed and found to contain over 11 kilograms of marijuana.

23

63.     Subsequently, a controlled delivery was executed by Inspectors to 26 Sack Street, North Providence, where a female, later identified as Jacqueline Baez (hereinafter referred to as Baez) accepted the parcel.  Baez was immediately detained and read her Miranda rights.  Baez stated the parcel was for an individual named "Kevin LNU" who was going to pick up the parcel. The individual known as "Kevin LNU" was identified as Carl Sharp and was also detained. Both Baez and Sharp were charged with Manufacturing/possession/delivery of greater than 5 kilograms of marijuana and conspiracy via the Rhode Island Attorney General's Office.[14]

**Wolfe mailed MOORPARK ST PARCEL 2 which contained $3,000**

64.     On or about March 30, 2023, while reviewing USPS proprietary databases, I learned that an individual or device that was querying the status of SACK ST PARCEL 1, used the same internet protocol address as an individual or device that was also querying the status of a Priority Mail parcel shipped to 10707 Moorpark St #304 Toluca Lake CA 91602 on March 29, 2023, from the Rolfe Square Post Office, located in Cranston, RI 02910.  The Priority Mail Parcel shipped to 10707 Moorpark St #304 Toluca Lake CA 91602 (herein referred to as "MOORPARK ST PARCEL 2").  I was able to obtain an image of MOORPARK ST PARCEL 2 and discovered the following address details:  To: Adrian Miller 10707 Moorpark St #304 Toluca Lake CA 91602; from: T TRAyNoR[15] 560 Prospect St #351 Pawt RI 02860.

65.     I was able to retrieve surveillance video from the Rolfe Square Post Office for the MOORPARK ST PARCEL 2 transaction.  Upon reviewing the surveillance video, I observed a

---

[14] This is the same case for which Sharp is currently on probation.

[15] According to Cranston Police Department Detective Warren Henslear, Trisha Traynor is believed to be Wolfe's girlfriend.

heavy-set white male, who appeared to be balding, enter the post office at approximately 3:30

pm, retrieve a small parcel box and stand with his back to the camera near a counter. It appeared

the unknown white male was preparing the parcel to be shipped. Approximately five minutes

later, the unknown white male approached the counter, presented MOORPARK ST PARCEL 2

for shipment, then paid cash for the transaction.

66.    On April 4, 2023, in an attempt to identify the mailer of MOORPARK ST

PARCEL 2, I sent a copy of the surveillance photo of the unknown male shipping MOORPARK

ST PARCEL 2 from the Rolfe Square Post Office to Cranston Police. Later that day, Cranston

Police Detective Warren Henesler contacted me and advised the individual in the surveillance

photo appeared to be William Wolfe. Detective Henesler advised that Wolfe was a target in an

ongoing methamphetamine investigation conducted by the Cranston Police Department and the

FBI Safe Streets Task Force (SSTF). Detective Henesler provided me with a previous booking

photograph of Wolfe that I compared with the surveillance video taken from Rolfe Square Post

Office, and based on my review, I believe that it was Wolfe who shipped MOORPARK ST

PARCEL 2.

67.    Detective Henesler also stated Sharp was associated with Wolfe. In 2018,

Cranston Police stopped Sharp after he met with Wolfe at Wolfe's then residence, located at 984

Pontiac Avenue, Cranston in 2018. Cranston Police reported that Wolfe exited the residence,

walked out to a black Jeep, and spoke to the operator through the car window. After a brief

exchange, both the operator, who was later identified as Sharp, and Wolfe walked into the

residence. Approximately five minutes later, Sharp exited the residence and left in the Jeep. A

traffic stop was initiated. Sharp was taken into custody for having counterfeit license plates and

having counterfeit registration paperwork.  Sharp was found to be in possession of $1,450.00 during a search incident to arrest.

68.     On April 7, 2023, the Honorable Patricia A. Sullivan, Magistrate Judge for the District of Rhode Island, authorized a search warrant for MOORPARK ST PARCEL 2.  On the same date, Postal Inspectors Michael Maccarone, James Foley, and I executed the search warrant and discovered the following $3,000 of U.S. currency concealed within a pair of pink winter gloves.

69.     Later, on December 4, 2023, William Wolfe and Trisha Traynor were arrested by the Pawtucket Police Department Special Squad for methamphetamine trafficking.  At that time, Wolfe was interviewed by the Pawtucket Police.  During that interview, Pawtucket Police detectives advised Wolfe that other detectives were searching a garage in Lincoln, RI where they had followed Wolfe prior to his arrest.  Wolfe told them that he stored a vehicle there.  Wolfe also said that a friend, Carl Sharp, also stored a vehicle at the garage.  Wolfe stated he went to the garage that morning to start both vehicles, which was something he does every week.  Wolfe said that he had the keys to his vehicle as well as Sharp's vehicle in Wolfe's BMW.

**COLUMBIA STREET PARCEL 1 shipped by Sharp and
COLUMBIA STREET PARCELS 2 and 3**

70.     On June 20, 2023, Inspectors responded to the Warwick Pilgrim Post Office after a customer came to the post office to return a parcel she did not want.  The customer identified as A.R. stated that she had opened the parcel and discovered a crystalized object inside some clothing.  Inspectors took possession of the parcel and transported it back to the Providence domicile. The parcel (herein referred to as COLUMBIA ST PARCEL 1) was:

- From: J. Powell 3999 Delus Dr., Las Vegas NV 89103
- To: A.R.[16] 127 Columbia St[17] 2nd flr., Cranston RI 02905

71.    Inspector Maccarone and I searched COLUMBIA ST PARCEL 1. We discovered within various articles of clothing, four (4) individually wrapped black bundles containing Ziploc bags of a white crystallized substance that field tested positive for methamphetamines (TruNarc test).  I sent the drugs to the USPIS Forensic Laboratory Services where they were analyzed by a chemist and determined to be 1,765.4 grams of a crystalline substance containing d-methamphetamine hydrochloride.  Quantitative analysis of a composite from the 4 samples was found to contain 99 ± 3% d-methamphetamine hydrochloride.

72.    Inspectors interviewed A.R.  She said that her landlord had left the parcel by her door after it was delivered.  A.R. thought it was a gift but admitted she was not expecting anything.  A.R. stated that when she opened COLUMBIA ST PARCEL 1, she discovered several pieces of clothing and inside one of the pieces of clothing, she felt a hard object.  A.R. removed the hard object to find a black object that contained a crystalized substance.  A.R. stated that she observed an "unsavory looking" African American male walking in front of her house.  Then, A.R. heard a knock on her back door.  Upon opening the door, A.R. observed the same African American male standing there.

---

[16] A.R.'s name on the package was spelled slightly different from A.R.'s actual spelling of her name.

[17] According to Detective Henslear, Wolfe had been seen on several occasions at 127 Colombia Street.  Specifically, on November 3, 2023, Detectives followed Wolfe after he left his residence located at 1827 Pawtucket Avenue, Pawtucket, Rhode Island.  Wolfe met with an individual on Norwood Avenue in Providence and then traveled to 127 Colombia Street, Cranston.

73.     A.R. stated the African American male asked her for COLUMBIA ST PARCEL 1, indicating he was expecting a parcel from his sister, who lives in Las Vegas, and the parcel would have clothes in it.   A.R. told the African American male that she knew nothing about a parcel.  A.R. advised that after the African American male left the area, she took COLUMBIA ST PARCEL 1 back to the post office.

74.     On June 21, 2023, I requested assistance from the Phoenix Division for recovery of any video surveillance of the mailing of COLUMBIA ST PARCEL 1 from the Emerald Station Post Office on June 17, 2023.  On June 27, 2023, Acting Physical Security Specialist (A/PSS) Gene Barton recovered the surveillance video and sent it out on June 29, 2023.  On July 6, 2023, I received the surveillance video and immediately reviewed it.  I observed an African American male, wearing a black hat, black t-shirt and shorts approaching the counter at approximately 1:58 pm.  I compared the surveillance video with Sharp's driver's license photograph, and I believe that Sharp was the individual who shipped COLUMBIA ST PARCEL 1.

75.     I sent the COLUMBIA ST PARCEL 1 box to the USPIS Forensic Laboratory Services and requested fingerprint analysis on the parcel.  On February 5, 2024, Senior Forensic Latent Print Analyst Patricia Cornell, while examining COLOMBIA ST PARCEL 1 was able to develop four latent fingerprints, specifically on the inner flaps of the parcel and under the tape removed from the parcel.  Senior Forensic Latent Print Analyst Cornell searched the FBI database and compared the latent fingerprints to SHARP's known prints and concluded that one fingerprint belonging to Sharp was located on the inner flap of the parcel.

76.     In May 2024, I interviewed the owner of 127 Columbia Street, Cranston, RI.  The owner identified Wolfe in a photo line-up and told me that Wolfe had been his property manager for the past three years.

### Financial Investigation

77.     I also conducted a financial investigation of Sharp with the assistance of the FBI. I learned that Sharp maintained a personal bank account at Bank of America ("BoA").  I was unable to discover any business bank accounts in Sharp's name although I am aware that he formed a purported transportation company, C.Sharp Transportation, LLC, in August 2022.

78.     As stated above, between January 2022 and May 2024, Sharp deposited over $320,000 in cash into his personal bank account. The next largest source of deposits into Sharp's BoA account after cash was from a source called, "Erie Custom Trus" which appears to be a payroll company; however, after an extensive online search for a payroll company called 'Erie Custom Trus," I was unable to locate any company by that name.  The payments, which were normally over $1,000.00, were made once or twice a month into Sharp's BoA account.  In total, between 2022 through April 2024, Sharp deposited $84,733.00 from the "Erie Custom Trus," which were then commingled with his extensive cash deposits.

79.     In April 2024, Inspectors spoke to an agent with the U.S. Department of Labor who reported that a company called "J&L Transportation Inc," based in Phoenix, Arizona, listed earnings for Sharp for the last quarter of 2023 at approximately $14,000.  The Department of Labor also reported that in the first quarter of 2024 "J&L Transportation Inc" reported earnings

for Sharp of approximately $10,000.[18]  During the two quarters reviewed, these earnings were the only reported earnings for Sharp that the agent could locate, and they do not explain the $46,968 in cash deposited into Sharp's bank account in the last quarter of 2023 or the $27,564 in cash deposited into his bank account in the first quarter of 2024.

80.     A review of Sharp's source of income dating back to 2022 is detailed below:

| Source | 2022 Count | Sum | 2023 Count | Sum | 2024 Count | Sum | Total Count | Total Sum |
|---|---|---|---|---|---|---|---|---|
| Cash | 133 | 130,698 | 118 | 158,581 | 19 | 32,048 | 270 | 321,327 |
| Erie Custom Trus | 27 | 40,460 | 26 | 40,089 | 10 | 14,553 | 63 | 95,102 |
| MSPBNA[19] Transfer | 16 | 22,477 | 6 | 36,000 | 6 | 7,504 | 28 | 65,981 |
| Natisha Mitchell[20] | 23 | 19,257 | 14 | 20,530 | 3 | 400 | 40 | 40,187 |
| Capital One | | | 8 | 40,090 | | | 8 | 40,090 |
| Cash App | 41 | 16,357 | 4 | 4,339 | | | 45 | 20,695 |
| Miscellaneous Credit | 8 | 2,088 | 9 | 1,681 | 21 | 14,000 | 38 | 17,770 |
| Jacqueline | 16 | | 9 | | 3 | | 28 | |

[18] A review of the Arizona State Corporations Commission Business records revealed "J&L Transportation Inc" was a legitimate cooperation and has been since 1987.  Per the Corporations Commission records, the business deals with the transportation of "general commodities."

[19] On June 4, 2024, Morgan Stanley provided records related to this account.  Upon review of account ending in 4145, which was a money market account belonging solely to Sharp, the account records listed (401) 259-5466 (**Device 1**) as Sharp's primary phone number.  The account ending in 4145 was opened in October 2018 and as of the end of April 2024, had an ending balance of $4,423.14.

[20] Natisha Mitchell and Carl Sharp reside together in Peoria, Arizona (Sharp's residence) and share a PO Box in Glendale, Arizona.  Mitchell and Sharp have a child together as well.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Baez[21] | | 5,830 | | 4,000 | | 4,440 | | 14,270 |
| MGM Bet | 31 | 4,367 | 24 | 6,544 | 12 | 1,299 | 67 | 12,210 |
| AZ Teller Transfer | | | | | 3 | 10,274 | 3 | 10,274 |
| Ally Bank | | | 2 | 10,228 | | | 2 | 10,228 |
| Pamela Graham | 2 | 1,700 | 1 | 1,600 | 2 | 2,500 | 5 | 5,800 |
| Treasury Payment | | | | | 1 | 5,220 | 1 | 5,220 |
| Carl Sharp | 9 | 4,235 | | | | | 9 | 4,235 |
| ETRADE | 6 | 2,800 | | | | | 6 | 2,800 |
| Ashley Green | 2 | 2,600 | | | | | 2 | 2,600 |
| CA Teller Transfer | | | | | 1 | 1,000 | 1 | 1,000 |
| Western Union | 2 | 850 | | | | | 2 | 850 |
| **Grand Total** | **316** | **253,720** | **221** | **323,682** | **81** | **93,239** | **618** | **670,640** |

81.     I know that Wolfe was arrested in December 2023, and he remains incarcerated at the ACI.  Since the end of January 2024, Sharp's cash deposits have dropped off dramatically as he only deposited $12,256.00 in cash between February 5, 2024, and May 22, 2024.

82.     I am also aware that between May 2021 and April 2024, Sharp withdrew over $225,000 in cash at casinos.  As stated in the summary section, based on my training and experience, I know that casinos are often used to launder money by converting illicit funds into chips and then cashing out those chips after gambling.  Sharp's use of income is detailed below:

---

[21] Jacqueline Baez and Carl Sharp were both arrested in 2012 for Possession and Distribution of a controlled substance, marijuana, after a controlled delivery of a USPS parcel containing marijuana.  Baez plead nolo contendere and was sentenced to 10 years in prison in 2014.  Seven (7) years of the sentence was suspended.  Baez' probation was terminated in 2019.  Sharp and Baez are still in contact per telephone call records.

| Use | 2022 Count | Sum | 2023 Count | Sum | 2024 Count | Sum | Total Count | Total Sum |
|---|---|---|---|---|---|---|---|---|
| Desert Diamond Casino | 102 | (68,553) | 57 | (76,392) | 14 | (26,225) | 173 | (171,169) |
| Cash | 82 | (50,488) | 54 | (39,355) | 23 | (17,200) | 159 | (107,043) |
| Miscellaneous Debit | 1056 | (35,931) | 912 | (31,892) | 237 | (11,067) | 2205 | (78,890) |
| MSPBNA (Morgan Stanley) Transfer | 40 | (33,050) | 29 | (26,563) | 1 | (5,000) | 70 | (64,613) |
| Capital One CD | 2 | (8,000) | 6 | (32,000) | | | 8 | (40,000) |
| Zelle | 59 | (14,734) | 36 | (9,991) | 25 | (13,274) | 120 | (37,998) |
| Capital One | 40 | (8,621) | 38 | (12,805) | 10 | (2,530) | 88 | (23,956) |
| Twin River Casino | 15 | (11,290) | 4 | (8,416) | | | 19 | (19,706) |
| Everi Casino | 29 | (5,437) | 15 | (3,551) | 27 | (8,351) | 71 | (17,339) |
| Ally Bank | 10 | (3,749) | 2 | (10,000) | | | 12 | (13,749) |
| WITHDRAWAL | | | 1 | (13,000) | | | 1 | (13,000) |
| Bet MGM | 48 | (4,120) | 99 | (7,705) | 23 | (1,040) | 170 | (12,865) |
| Citi Card | | | 27 | (10,483) | 10 | (1,984) | 37 | (12,467) |
| Credit One Bank | 27 | (2,679) | 19 | (4,326) | 8 | (750) | 54 | (7,755) |
| IPFS | | | 3 | (4,880) | 1 | (2,680) | 4 | (7,560) |
| Card 5689 Payment | | | 7 | (2,100) | 14 | (4,623) | 21 | (6,723) |
| Wynn Casino | | | 5 | (6,024) | | | 5 | (6,024) |
| Treasury Direct | | | 1 | (5,000) | | | 1 | (5,000) |
| CHECK | | | 1 | (3,400) | | | 1 | (3,400) |
| Shawn Canales | | | 2 | | 3 | | 5 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | (1,825) | | (1,500) | | (3,325) | |
| Etrade | 1 | (2,800) | | | | 1 | (2,800) |
| Diesel Headquarters[22] | | | 1 | (2,513) | | 1 | (2,513) |
| CarMax | 1 | (2,026) | | | | 1 | (2,026) |
| Palms Casino | | | 2 | (1,009) | | 2 | (1,009) |
| Jacqueline Baez | | | | | 4 (750) | 4 | (750) |
| **Grand Total** | **1512** | **(251,477)** | **1321** | **(313,229)** | **400 (96,974)** | **3233** | **(661,680)** |

83.     I am aware that individuals often obtain online access to their bank accounts that allows them to monitor their accounts and to conduct financial transactions via the internet.  I am also aware that individuals may gain online access to their bank accounts through their smartphones.  Based on my review of Sharp's bank account records, I observed Zelle and CashApp transactions, which I know may be conducted through an application on a smartphone.  I also saw online payments to Citi Card and Capital One.  I also know that Sharp had Citi and Capital One credit cards in his possession at the time of his arrest.  Based on these observations and my training and experience, I think that it is likely that **Device 1** and **Device 2** will contain evidence of financial transactions conducted by Sharp in furtherance of his drug trafficking and money laundering activities.

**ITEMS TO BE SEIZED, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

84.     Based upon the facts contained in this Affidavit and my training and experience related to how drug traffickers use their cellular telephones and the type of evidence that may be

---

[22] Diesel Headquarters is a repair shops for Diesel repair on trucks, trailers, and utility task vehicles (UTVs), and is located in Glendale, Arizona.

recovered from cellular telephones, I submit there is probable cause to believe that the items listed in Attachment B will be found on **Device 1** and **Device 2**.

85.     Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.     Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.  Drug trafficker often maintain electronic records of these meetings.

b.     Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

c.     Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Facebook Messenger, WhatsApp, Snapchat and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

86.    In this case, I believe that Sharp used mobile devices to further his drug trafficking and money laundering activities.  Specifically, the investigation has revealed evidence of the following:

a.   Sharp used cellular telephones to communicate with his drug customers, Wolfe and Manning.

b.   Sharp used mobile devices to track packages.

c.   Sharp conducted financial transactions online and used money transfer applications that are typically associated with mobile devices like smartphones.

d.   Sharp flew between Arizona and Rhode Island on multiple occasions, and that his bank records suggest that he traveled to California and Nevada.  In my experience, individuals often use their cellular telephones to make reservations, monitor flights, and receive communications from the airline with respect to their flights.

87.    Based on my training, experience, and research, I know that Devices such as **Device 1** and **Device 2** have capabilities that allow them to serve as a wireless telephone, digital

35

camera, portable media player, GPS navigation device, and PDA.[23]  In my training and

experience, examining data stored on devices of this type can uncover, among other things,

---

[23] Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly

evidence that reveals or suggests who possessed or used the device as well as evidence of the criminal activity.

88.     Based on my knowledge, training, and experience, I know that cellular telephones have evolved in their technology such that they can run multiple programs (called applications), function as online banking tools, facilitate the purchase of goods and services online, serve as a repository for multimedia files, and function as communication devices.

89.     Based upon my experience, training, and knowledge, I know that persons involved in drug trafficking and money laundering, use electronic devices, namely cellular

---

available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

telephones, to plan, coordinate and conduct their crimes. Evidence of this activity in the form of emails (or electronic mail), text messages and voicemails from co-conspirators, contact information for co-conspirators, call logs showing communications between co-conspirators, photographs, videos, audio files, messaging "apps" or services, such as WhatsApp and Signal, which are used to communicate with co-conspirators in an effort to evade detection and prosecution, calendars, diaries, notes, internet browsing entries, searches, and history, location information of the cellular telephone user, such as GPS coordinates, and navigation is therefore stored within the internal memory of the devices used. This evidence is often critical to establishing the conspiratorial conduct of the subjects using the devices.

90.    As described above, I know that cellular telephones can be used for:

a. Voice, text, and email communications, through utilization of pre-loaded communications applications or other user-loaded applications that provide similar functionalities, including WhatsApp and Signal;

b. Planning, coordination, and recording notes, through utilization of pre-loaded calendar, voice memo, note, and to-do list applications or other user-loaded applications that provide similar functionalities,

c. Performing internet, YouTube, and other applications' searches, through utilization of pre-loaded search and browsing applications or other user-loaded applications that provide similar functionalities,

d. Photography, videography, and photo and video storage (i.e. albums), through utilization of pre-loaded camera and album applications or other user-loaded applications that provide similar functionalities,

e. Routing funds and managing funds, through utilization of banking, cryptocurrency, and shopping applications,

f. Directions and maps, through utilization of pre-loaded mapping, travel, and direction applications or user-loaded applications that provide similar functionalities, and

g. Storing password information necessary to review or access applications and accounts.

91.     From my training and experience, I know that various cellular telephone applications – both pre-loaded or user loaded – record the cellular telephone's geographic location (and thereby the user's geographic location) and maintain logs of communications, such as call logs. From my training and experience, I know that a variety of pre-loaded and user-loaded applications on cellular telephones contain information that can aid in identifying the user of the cellular device. For example, such user attribution information can be found in photographic records, videographic records, voice messages, emails, texts, geolocation data, notes, calendars, to-do lists, maps, financial applications, shopping applications, and search and browsing records. From my training and experience, I know that internet protocol information is commonly found in cellular telephones and can identify geographic locations used by co-conspirators, which in turn can aid in identifying co-conspirators.

92.     Based upon my experience and training, I know that cellular telephones, like **Device 1** and **Device 2**, can store information for long periods of time. This information includes communication records, phone (and thereby user) geolocation data, notes, calendar records, to-do list records, records that can be used for user attribution, map data, photographs, videos, albums, financial data, and shopping records. Similarly, things that have been viewed via the internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools, even if the information has been deleted from the device.

93.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

      a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      f.   From my training and experience, I believe that an electronic device used to commit a crime may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

    94.    *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

    95.    *Manner of execution.*  Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

96.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Device 1** and **Device 2** described in Attachment A to seek the items described in Attachment B.


RICHARD F. ATWOOD
_____

Inspector Richard F. Atwood
U.S. Postal Inspection Service

> Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1. by:  **Telephone** (specify reliable electronic means)
>
> _____          _____
> Date                                          Judge's signature
>
> _____          _____
> City and State                              Printed Name and Title

## **ATTACHMENT A**

The property to be searched is:

- A black and dark gray iPhone with a black protective case assigned call number 401-259-5466, hereinafter "Device 1."  Device 1 is currently located at my office at 24 Corliss Street, Providence, RI.

- A black "BLU" smartphone, hereinafter "Device 2."  Device 2 is currently located at my office.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Devices described in Attachment A that relate to violations of 21 U.S.C.

§§ 841 and 846 (distribution of methamphetamine and conspiracy), and 18 U.S.C. § 1956

(money laundering and conspiracy) and involve Carl Sharp since November 1, 2022, including:

    a.   lists of customers and related identifying information;

    b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.   any information recording Carl Sharp's schedule or travel from November 2022 to the present;

    e.   photographs of Carl Sharp, William Wolfe, Tajah Manning, Trisha Traynor, Jacqueline Baez, any other unidentified co-conspirators, vehicles, packages, U.S. currency, and drugs;

    f.   communications between with the U.S. Postal Service, airline personnel, financial institutions, casinos, William Wolfe, Tajah Manning, Trisha Traynor, Jacqueline Baez, and any other unidentified co-conspirators;

    g.   all bank records, checks, credit card bills, account information, and other financial records.

      b.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      c.     Records evidencing the use of the Internet Protocol addresses to communicate with U.S. Postal Service servers, including:

      a.   records of Internet Protocol addresses used;

      b.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the USPIS may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3